[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Hairston,* Slip Opinion No. 2019-Ohio-1622.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2019-OHIO-1622

THE STATE OF OHIO, APPELLANT, *v.* HAIRSTON, APPELLEE.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Hairston,* Slip Opinion No. 2019-Ohio-1622.]

*Constitutional law—Fourth Amendment—Brief investigative stops—Cumulative facts support trial court's conclusion that police officers responding immediately to sound of nearby gunshots had reasonable suspicion to stop only person seen in area—Officers did not convert investigative stop into arrest by drawing weapons when approaching suspect—Court of appeals' judgment reversing trial court's denial of motion to suppress reversed.*

(No. 2017-1505—Submitted January 29, 2019—Decided May 2, 2019.)

APPEAL from the Court of Appeals for Franklin County, No. 16AP-294, 2017-Ohio-7612.

_____

**DEWINE, J.**

{¶ 1} As they were responding to a radio call one night, two police officers heard the sound of nearby gunshots. They immediately drove a short distance to

the area where the shots seemed to be coming from and, with guns drawn, detained the only person in the area. A pat-down of the man revealed a handgun. The question before us is whether this stop—a so-called *Terry* stop—violated the Fourth Amendment to the United States Constitution, *see Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The court of appeals held that it did and concluded that the trial court should have granted a defense motion to suppress the handgun and other evidence obtained during the stop. We disagree; we find no violation of the Fourth Amendment and reverse the judgment below.

## I. Police respond to the sounds of gunshots, pat down the only person in the area, and recover a concealed firearm

{¶ 2} Columbus Police Officer Samuel Moore testified to the events that are at the center of this case during the trial court's hearing on the motion to suppress. As Officer Moore recounted the incident, at about 9:20 one evening in March 2015, he and his partner responded to a police dispatch about a domestic dispute. As they were getting out of their police cruiser, they heard the sound of four or five gunshots. The shots "weren't faint"; rather, "they appeared to be close." The officers immediately jumped back in their car and rushed to the area where the shots seemed to be coming from—outside a nearby elementary school.

{¶ 3} It took the officers about 30 to 60 seconds to get to an intersection just outside the school—a distance by car of about four-tenths of a mile. As they approached the intersection, they spotted an individual whom they later identified as Jaonte Hairston, walking away from the school into a crosswalk while talking on a cell phone. There was no one else around. The officers got out of the car and with weapons drawn ordered Hairston to stop. Officer Moore asked Hairston if he had heard the gunshots. Hairston replied that he had. Officer Moore then asked Hairston whether he was carrying any weapons. Hairston said he had a gun and nodded toward his jacket pocket. Officer Moore patted Hairston down and

retrieved a handgun from his jacket. According to Officer Moore, at the time of the stop, Hairston talked to the officers calmly but "was somewhat nervous."

{¶ 4} Following the arrest, Officer Moore wrote a police report stating that when the officers were exiting their cruiser, "they heard 4 to 5 gun shots west of their location" and that they "responded to the area where they heard the gun shots from." In explaining his actions, Officer Moore testified that he had patrolled the zone where he was working that night for his entire six-year police career. Drug activity—as well as assaults, robberies, and domestic violence—frequently occurred in the area around the school during the evening hours. He had previously made arrests there for those types of crimes, including gun-related arrests.

{¶ 5} Hairston was charged with carrying a concealed weapon in violation of R.C. 2923.12(A). He filed a motion to suppress the evidence obtained during the stop on the basis that the officers lacked reasonable suspicion to detain him.

{¶ 6} Following the hearing, at which Officer Moore was the only witness to testify, the trial court denied the motion to suppress. Applying the United States Supreme Court's decision in *Terry*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889, the court concluded that the officers had reasonable suspicion to perform an investigative stop.

{¶ 7} The Tenth District Court of Appeals saw it differently. The court reasoned that the sound of gunfire only implied that "someone, somewhere, had shot a gun." 2017-Ohio-7612, 97 N.E.3d 784, ¶ 13. It determined that there was no particularized connection between the gunshots and Hairston: "Hairston was simply the first person the officers saw after driving nearly one-half mile from where they stood when they heard the gunshots." *Id.* Nor did Hairston's actions before the stop and the surrounding contextual factors—Hairston's presence in an area with a high crime rate, his nervousness, or the time of night—amount to reasonable suspicion. *Id.* at ¶ 14-15. The appellate court reversed the trial court's judgment and remanded the case for further proceedings.

**{¶ 8}** We accepted the state's discretionary appeal. 152 Ohio St.3d 1420, 2018-Ohio-923, 93 N.E.3d 1002.

## II. The officers had reasonable suspicion to stop Hairston

**{¶ 9}** The Fourth Amendment to the United States Constitution prohibits unreasonable searches and seizures. *Accord* Ohio Constitution, Article I, Section 14.[1] Its protections extend to brief investigative stops that fall short of traditional arrests. *United States v. Arvizu*, 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002). An officer may perform such a stop when the officer has a reasonable suspicion based on specific and articulable facts that criminal behavior has occurred or is imminent. *Terry*, 392 U.S. at 30, 88 S.Ct. 1868, 20 L.Ed.2d 889. And when the officer is "justified in believing" that an individual may be "armed and presently dangerous," the officer may conduct a limited protective search of the individual for concealed weapons. *Id.* at 24; *Adams v. Williams*, 407 U.S. 143, 146, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972).

**{¶ 10}** The reasonable-suspicion standard is less demanding than the probable-cause standard used when analyzing an arrest. *United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989). The determination whether an officer had reasonable suspicion to conduct a *Terry* stop must be based on the totality of circumstances "viewed through the eyes of the reasonable and prudent police officer on the scene who must react to events as they unfold." *State v. Andrews*, 57 Ohio St.3d 86, 87-88, 565 N.E.2d 1271 (1991). An assessment of the totality of the circumstances "does not deal with hard certainties, but with probabilities." *United States v. Cortez*, 449 U.S. 411, 418, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981). We consider the cumulative facts "not in terms of library

---

1. Article I, Section 14 of the Ohio Constitution contains nearly identical wording to the Fourth Amendment. The parties have not presented any argument under the Ohio Constitution; thus, we do not consider whether different standards might apply under the two provisions.

analysis by scholars, but as understood by those versed in the field of law enforcement." *Id.*

{¶ 11} Here, the cumulative facts support the conclusion that the officers had a reasonable suspicion to stop Hairston. First, Officer Moore personally heard the sound of gunshots—the gunshots were not faint and sounded close-by. This is not a case in which the officers relied on a radio dispatch or other secondhand information about shots being fired, *e.g.*, *In re D.W.*, 184 Ohio App.3d 627, 2009-Ohio-5406, 921 N.E.2d 1114, ¶ 32 (2d Dist.), but one in which they heard and immediately reacted to the sound of nearby gunfire.

{¶ 12} Second, Officer Moore knew from personal experience that crime often occurred at night in the area where the stop took place. Officer Moore had worked the same beat for six years. He was familiar with drug and other criminal activity near the school, and he had made arrests for illegal weapons and other crimes there in the past. An officer's experience with criminal activity in an area and an area's reputation for criminal activity are factors we have found relevant to the reasonable-suspicion analysis. *Andrews* at 88; *State v. Bobo*, 37 Ohio St.3d 177, 179, 524 N.E.2d 489 (1988). Further, the stop occurred after dark—another circumstance we have found to be of some significance in the reasonable-suspicion analysis. *Bobo* at 179.

{¶ 13} But the most important considerations here are that the stop occurred very close in time to the gunshots and Hairston was the only person in the area from which the shots emanated. Officer Moore testified that upon hearing the shots, the officers immediately jumped in the cruiser and that it took them only 30 to 60 seconds to get to the intersection outside the school. When they arrived, Hairston—and no one else—was there.

{¶ 14} We conclude that these facts, taken together and viewed in relation to each other, rise to the level of reasonable suspicion. In holding otherwise, the court of appeals went through these factors individually and discounted the

significance of each one. It determined that the facts that the officers heard the gunshots and stopped the only person in the area were of little moment because there was no "particularized connection" between the gunshots and Hairston. 2017-Ohio-7612, 97 N.E.3d 784, at ¶ 13. It further reasoned that the contextual factors asserted by the state—that the stop occurred at night and in an area known to the officers for criminal activity—provided "no additional support" to the state's claim of reasonable suspicion. *Id.* at ¶ 15. It also placed weight on the fact that Hairston did not flee when the officers told him to stop. *Id.* at ¶ 14.

{¶ 15} The court of appeals went astray by focusing on individual factors in isolation rather than on the totality of the circumstances. *Arvizu*, 534 U.S. at 274, 112 S.Ct. 744, 151 L.Ed.2d 740. The reasonable-suspicion determination must be "based on the *collection* of factors, not on the individual factors themselves." (Emphasis sic.) *State v. Batchili*, 113 Ohio St.3d 403, 2007-Ohio-2204, 865 N.E.2d 1282, ¶ 19; *accord Arvizu* at 274. The court also erred in refusing to give any weight to the contextual factors asserted by the state. The "officers [were] not required to ignore the relevant characteristics of [the] location in determining whether the circumstances [were] sufficiently suspicious to warrant further investigation." *Illinois v. Wardlow*, 528 U.S. 119, 124, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000). Further, the court placed undue reliance on the fact that the suspect did not flee. *See State v. Williams*, 51 Ohio St.3d 58, 59, 63, 554 N.E.2d 108 (1990) (officer had reasonable suspicion despite defendant's lack of flight).

{¶ 16} While the court of appeals may have been correct in concluding that none of the individual factors that the state relied on was sufficient in itself to create a reasonable suspicion, we conclude that taken together—considering the totality of the circumstances through the eyes of a reasonable police officer—the cumulative facts did rise to the level of reasonable suspicion.

{¶ 17} The chief justice's dissenting opinion claims that Officer Moore "did not have a specific idea of where the shots came from, and he merely stopped the

first person he encountered while driving." Dissenting opinion, O'Connor, C.J., at ¶ 41. But this assertion is contrary to Officer Moore's testimony that "[t]he shots sounded as though they were coming from the west near the elementary." The suggestion that the officers simply stopped the first person they saw ignores Officer Moore's testimony that they had traveled to and arrived at the location they believed the shots had emanated from—the elementary school.

{¶ 18} Part of police work is investigating criminal activity that officers detect while out on patrol. Here, the officers did exactly what one would expect reasonable and prudent police officers to do in their situation. Upon hearing gunshots, they proceeded immediately to the location they believed the shots to be coming from to investigate. Finding only Hairston in the area and knowing that criminal activity frequently occurred there, the officers were not required to ignore Hairston's presence, nor was it necessary for them to attempt to speak to him without taking precautions for their own safety. To the contrary, it was reasonable and prudent for the officers to stop Hairston to see if he was the source of or had information about the gunshots. And because the gunshots gave the officers reason to suspect that Hairston was armed, they were justified in patting him down for their safety. *Terry*, 392 U.S. at 30-31, 88 S.Ct. 1868, 20 L.Ed.2d 889; *Andrews*, 57 Ohio St.3d at 89, 565 N.E.2d 1271.

{¶ 19} Thus, we conclude that the trial court's denial of the motion to suppress was supported by competent, credible evidence. *See State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8.

### III. The stop was not converted into an arrest

{¶ 20} Hairston also attempts to defend the judgment below on a ground different from the one that the court of appeals relied on: he argues that by approaching him with their guns drawn, the officers placed him under arrest and that they lacked probable cause for the arrest. We disagree. The officers' suspicions and the surrounding circumstances warranted approaching Hairston with

weapons ready. And because the officers were justified in having their weapons drawn, the showing of firearms did not convert the stop into an arrest.

{¶ 21} Police officers may take steps that are "reasonably necessary to protect their personal safety and to maintain the status quo during the course of [a] stop." *United States v. Hensley*, 469 U.S. 221, 235, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985). The "mere use or display of force in making a stop will not necessarily convert a stop into an arrest." *United States v. Hardnett*, 804 F.2d 353, 357 (6th Cir.1986). Whether an investigative stop is converted into an arrest depends on, first, whether the officers had reasonable suspicion to make the stop, and second, whether the degree of intrusion into the suspect's personal security was reasonably related to the officers' suspicions and the surrounding circumstances. *Id.* at 356, citing *Terry*, 392 U.S. at 19-20, 88 S.Ct. 1868, 20 L.Ed.2d 889.

{¶ 22} Investigating gunshots and suspects who are potentially armed presents a dangerous situation for the responding officers. Here, the officers were in an area known for criminal activity and they had just heard someone fire a gun. Their suspicions that it was Hairston who had fired the shots and that he was still armed justified the precautions they took in approaching him with their weapons drawn. Because the officers had legitimate safety concerns, the fact that they had their guns drawn when they approached Hairston did not convert the investigative stop into an arrest. *Hardnett* at 357.

## IV. Conclusion

{¶ 23} Based on the totality of the circumstances, the police officers had reasonable suspicion to stop Hairston. Furthermore, they did not convert the stop into an arrest by approaching Hairston with their weapons drawn. We reverse the judgment of the court of appeals.

Judgment reversed.

KENNEDY, FRENCH, and FISCHER, JJ., concur.

DONNELLY, J., concurs in judgment only, with an opinion.

O'CONNOR, C.J., dissents, with an opinion.

STEWART, J., dissents, with an opinion joined by O'Connor, C.J.

_____

**DONNELLY, J., concurring in judgment only.**

**{¶ 24}** I concur in judgment only. Our sole task in this appeal is to decide whether Officer Samuel Moore reasonably suspected that appellee, Jaonte Hairston, was the person who fired the gunshots that police had heard nearby in a residential neighborhood. This task is resolved by reviewing the totality of the circumstances, as a court does in any run-of-the-mill suppression case in which the state asserts the probable-cause exception established in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Because there is no new standard of law to be determined here, the most appropriate action would be to dismiss this appeal as having been improvidently accepted. But if we are going to address the merits, our analysis needs to fit the facts of this case.

**{¶ 25}** The majority is correct that the time of night and high-crime reputation of an area can be relevant in determining whether *criminal activity* might be afoot. Majority opinion at ¶ 10, citing *State v. Andrews*, 57 Ohio St.3d 86, 88, 565 N.E.2d 1271 (1991) (police officer reasonably suspected that a crime might be occurring due to the suspect's flight and other furtive movements while in the dark of night in a high-crime neighborhood); *State v. Bobo*, 37 Ohio St.3d 177, 179, 524 N.E.2d 489 (1988) (police officer reasonably suspected that a drug crime might be occurring due to the suspect's furtive movements in a vehicle while parked at night in an area of very heavy drug activity). In Hairston's case, though, no one disputes that Officer Moore already knew that a crime involving the discharge of a firearm had occurred nearby and no one disputes that the shooter would almost certainly be armed 60 seconds after the fact. The only relevant *un*certainty was the identity of the person who had fired the shots. *Andrews* and *Bobo* are therefore inapposite.

**{¶ 26}** The fact that a crime recently occurred does not give police officers carte blanche to stop any person they find in the area; instead, before stopping a person, the officers must have an objective basis for suspecting that *that* particular person was involved in the criminal activity. *See United States v. Cortez,* 449 U.S. 411, 417-418, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981); *Ybarra v. Illinois*, 444 U.S. 85, 94, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979) ("The 'narrow scope' of the *Terry* exception [to the probable-cause requirement] does not permit a frisk for weapons on less than reasonable belief or suspicion directed at the person to be frisked * * *"). Nothing about the time of night or high-crime reputation of the neighborhood gave Officer Moore any insight into the identity of the shooter. Contrary to the majority's position, the Tenth District Court of Appeals was correct that the contextual factors of a nighttime stop and a high-crime area were legally irrelevant in Hairston's case.

**{¶ 27}** Instead, the salient facts here are that Officer Moore personally heard the sound of the shots being fired, immediately went to the location where the sound had originated, and encountered Hairston in the street in that area. Given how close Hairston was to the crime, in both time and place, I would hold that the trial court's determination of reasonable suspicion was legally justified. *See United States v. Goodrich*, 450 F.3d 552, 562 (3d Cir.2006) (holding that a suspect's "geographical and temporal proximity" to the scene of a crime is an "important factor militating strongly in favor of the validity of the stop"); *United States v. Fisher*, 597 F.3d 1156, 1159 (10th Cir.2010) (holding that the police were justified in stopping the only vehicle present at the scene three minutes after a report of shots fired).

**{¶ 28}** The trial judge himself noted that Hairston's case was "a close call." I agree. I think a perfectly reasonable finder of fact could have come to a different conclusion about the reliability and accuracy of Officer Moore's testimony and could have granted Hairston's motion to suppress. The Tenth District seems to

have arrived at that reasonable finding of fact. The problem, though, is that an appellate court cannot usurp the fact-finding role of the trial court.

{¶ 29} It is well established that "an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence" given that the trial court is "in the best position to resolve factual questions and evaluate the credibility of witnesses." *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. Only after accepting the trial court's factual findings as true should the appellate court proceed to determine whether those facts satisfy the applicable legal standard in a motion to suppress. *Id.*

{¶ 30} The Tenth District based its legal analysis on its own conclusion that Officer Moore had no objective knowledge about the circumstances of the crime immediately preceding the *Terry* stop beyond the fact that "someone, somewhere" had fired a gun. 2017-Ohio-7612, 97 N.E.3d 784, ¶ 13. The sole, unremarkable error before us in this appeal is that the Tenth District inappropriately disregarded the trial court's factual finding that the police knew when and where the shots had been fired.

{¶ 31} Because the trial court appropriately weighed the totality of the circumstances pursuant to *Terry* in reaching its decision and because the appellate court failed to defer to the trial court's factual findings regarding those circumstances as required by *Burnside*, the Tenth District's judgment should be reversed. Again, given that the standards articulated in *Terry* and *Burnside* are well established, a reversal by this court is quintessential error correction. But if the court remains committed to error correction in this case, I join the reversal by concurring in judgment only.

_____

**O'CONNOR, C.J., dissenting.**

{¶ 32} I dissent. I would conclude that the stop and search of appellee, Jaonte Hairston, violated the Fourth Amendment to the United States Constitution.

The facts known to the officers at the time did not support a reasonable suspicion that Hairston was engaged in criminal activity, the standard the United States Supreme Court established in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and that this court has applied many times. *See, e.g.*, *State v. Andrews*, 57 Ohio St.3d 86, 565 N.E.2d 1271 (1991); *State v. Bobo*, 37 Ohio St.3d 177, 524 N.E.2d 489 (1988). The majority opinion erodes the constitutional standard established in *Terry* and creates the unwise precedent that a police officer may conduct an investigative stop of any person present in a so-called "high crime" area as long as the officer has recently heard gunshots, without any specific and articulable facts pointing more directly to that *particular* person's being engaged in criminal activity. Because I cannot support this material erosion of the Fourth Amendment, I dissent.

### Relevant Background

{¶ 33} The majority presents one version of the facts based on the testimony of the only witness at the suppression hearing, Columbus Police Officer Samuel Moore. But Officer Moore reported slightly different facts on the department's arrest-information form,[2] and those differences underscore why the stop violated the *Terry* standard. Although the majority implies that Officer Moore believed that the gunshots came from outside a nearby elementary school, the arrest form more generally describes the gunshots as coming from "west of [the] location" of Officer Moore and his partner, Officer Frederick Kaufman. The officers' location when they heard the gunshots was several streets away at a residence from which a domestic dispute had been called in. At the suppression hearing, the state introduced an aerial photo that shows the location of the domestic-dispute call, the school, and the intersection where the officers stopped Hairston. The photo, which was admitted into evidence, demonstrates that Independence High School was

---

2. Officer Moore corroborated the veracity of the arrest form during cross-examination.

directly west of the officers' location when they heard the gunshots. The elementary school and the intersection where the stop took place were southwest of the officers' location.

{¶ 34} Indeed, "west" is as close as Officer Moore was able to pinpoint the location of the gunshots. At one point, Officer Moore's testimony substantiates his belief that the gunshots emanated from closer to the high school. At the suppression hearing, the prosecution asked Officer Moore to describe the layout and exterior of Independence High School. Following this line of questioning, Officer Moore stated that the gunshots "appeared to be close. They weren't faint. From my guesstimate, it was about the school." At another point, Officer Moore testified that the shots emanated "from the west near the elementary." The two schools are located on one large campus.

{¶ 35} While Officers Moore and Kaufman were on their way toward the high school, they saw Hairston walking into the crosswalk near the elementary school. The officers exited their cruiser with their service weapons drawn and instructed Hairston to show them his hands. Following that instruction, according to the arrest form, "Officer Kaufman kept his service weapon drawn to cover Officer Moore as he patted down Mr. Hairston for weapons." Then "Officer Moore asked Mr. Hairston if he heard the gunshots to which Mr. Hairston said he did. Officer Moore instructed Mr. Hairston to place his hands behind his back so he could pat him down."

{¶ 36} At the suppression hearing, Officer Moore affirmed the accuracy of the information he had reported on the arrest form and testified that it was not until *after* Hairston's hands were behind his back in preparation for the pat-down that Moore asked Hairston whether he had any weapons on him. The majority notes that Officer Moore's questioning of Hairston—during which he asked whether Hairston was carrying any weapons and Hairston said he had a gun and nodded toward his jacket pocket—occurred *prior* to the physical pat-down, implying that

the officers' search could still have been consensual at that point. But, as a reasonable police officer would know, a pat-down is lawful only when the officer is entitled to make a forcible stop. *Adams v. Williams*, 407 U.S. 143, 146, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972). Therefore, there is no question that at the time the pat-down process commenced, when Officer Moore instructed Hairston to place his hands behind his back, a forcible stop had occurred.

{¶ 37} We must determine whether there was reasonable suspicion to stop Hairston before that point.

**Analysis**

{¶ 38} The United States Supreme Court described the reasonable-suspicion standard in *Terry*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889, and the standard has changed little since then, although courts have further defined it. "[I]n justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Id.* at 21. *Terry* requires the court to "evaluate the reasonableness of a particular search or seizure in light of the particular circumstances." *Id.* The reasonableness of the suspicion must be judged against an objective standard: "[W]ould the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?" *Id.* at 21-22, quoting *Carroll v. United States*, 267 U.S. 132, 162, 45 S.Ct. 280, 69 L.Ed. 543 (1925). "The propriety of an investigative stop by a police officer must be viewed in light of the totality of the surrounding circumstances," *State v. Freeman*, 64 Ohio St.2d 291, 414 N.E.2d 1044 (1980), paragraph one of the syllabus, " 'through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training,' " *id.* at 295, quoting *United States v. Hall*, 525 F.2d 857, 859 (D.C.Cir.1976). But the search cannot be "based on nothing more substantial than inarticulate hunches * * *. And simple 'good faith on the part of the arresting officer is not

enough.' " *Terry* at 22, quoting *Beck v. Ohio*, 379 U.S. 89, 97, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964).

{¶ 39} Taken together, and when viewed through the careful eyes of a reasonably prudent law-enforcement officer, the specific and articulable facts in this case, in my view, did not give rise at the time the officers stopped Hairston to reasonable suspicion that he was engaged in criminal activity. Although the majority recites a number of cases that contain *some* similar facts that led to a finding of reasonable suspicion, the *totality* of the circumstances here requires a different conclusion.

{¶ 40} The majority seems to recognize that the sound of gunshots in a "high crime" area is not enough to establish reasonable suspicion for a stop in the absence of other factors,[3] and it therefore notes other "important considerations" that it believes help satisfy the standard for reasonable suspicion in this case. Majority opinion at ¶ 13. To bolster its conclusion that the officers had reasonable suspicion to stop Hairston, the majority identifies what it believes to be the two "most important considerations here"—that "the stop occurred very close in time to the gunshots and Hairston was the only person in the area from which the gunshots emanated"—without citing any precedent for the relevance of these considerations. *Id.* While these may be legitimate factors to consider, I would conclude that in this case, the totality of the circumstances that existed at the time

---

3. It is true that this court has determined that a law-enforcement officer's knowledge at the time he is contemplating the stop that crime is prevalent in the area is a legitimate factor to consider in the reasonable-suspicion analysis. *See Andrews*, 57 Ohio St.3d at 88, 565 N.E.2d 1271; *Bobo*, 37 Ohio St.3d at 179, 524 N.E.2d 489. It is also true that it is a legitimate factor to consider that the sound of gunshots could imply that a crime may be happening contemporaneously at a nearby location. *See, e.g.*, *State v. Tally-Clayborne*, 378 Wis.2d 741, 2017 WI App 80, 905 N.W.2d 844, ¶ 10. But these two factors alone generally are not enough. For instance, in *State v. Brooks*, a Florida appellate court observed that moments after hearing gunshots nearby, officers "may not frisk simply because they saw two men sitting on the steps at 4:00 o'clock in the morning * * * in a 'high crime' area." 281 So.2d 55, 56 (Fla.App.1973). In that case, one of the men "replied that he had heard nothing like a shot although he and his friend said they had been there a while." *Id.* The suspect's denial was a central factor leading the court to find reasonable suspicion. *Id.*

the officers conducted the stop did not support a reasonable suspicion by the officers that Hairston was engaged in criminal activity. The majority is lowering the *Terry* standard well below what the Constitution allows.

{¶ 41} For a stop based, in part, on recent gunshot sounds to be upheld, a court must find that the officer believed that the gunshots were fired in the immediate vicinity of the hearer such that the shooter would not have had time to flee prior to arrival of the officer. *See State v. Tally-Clayborne*, 378 Wis.2d 741, 2017 WI App 80, 905 N.W.2d 844, ¶ 10 (gunshots came from within one block of officer's location and officer saw suspect within 20 to 25 seconds of hearing gunshots); *People v. Basiak*, 50 Ill.App.3d 155, 156-157, 365 N.E.2d 570 (1977) ("shot appeared * * * to have originated from around the corner" and officers saw defendant immediately upon turning corner). But in this case, the fact that the stop occurred close in time to the gunshots is irrelevant because the shots were not particularly close in location, Officer Moore did not have a specific idea of where the shots came from, and he merely stopped the first person he encountered while driving in that direction.

{¶ 42} Unlike other cases in which courts have relied on the fact that the stop was made soon after gunshots had been heard to support a finding of reasonable suspicion, the officer here did not indicate that the gunshots had been fired particularly close-by. Officer Moore "guesstimate[d]" that the gunshots had been fired from the west. The majority places undue emphasis on one statement by Officer Moore that the gunshots came from "near the elementary" school, but ignores other testimony suggesting that the location was directly west and near the high school. These inconsistencies underscore Officer Moore's lack of confidence in the precise location of the gunshots.

{¶ 43} But, even if we accept that the shots came from somewhere on the campus of the two schools, Officer Moore was still between four-tenths and a half mile away from the location of the gunshots. That distance is farther than the one

16

or two blocks many courts have considered close for purposes of supporting reasonable suspicion when an officer immediately responded to gunshots and found only one person or group in the area. *See Tally-Clayborne* at ¶ 10 (one block); *Commonwealth v. Griffen-Jacobs*, Penn.Sup.Ct. No. 1891 EDA 2016, 2017 WL 4992754, \*1 (Nov. 1, 2017) (approximately one block); *Basiak* at 156 (around the corner); *State v. Brooks*, 281 So.2d 55, 56 (Fla.App.1973) (around the block); *People v. Lee*, 48 Ill.2d 272, 274, 269 N.E.2d 488 (1971) (about two blocks).

{¶ 44} Even in cases in which the location of the gunshots was very close, however, courts have typically relied on *additional* evidence—that directly implicated the defendant—to support a finding of reasonable suspicion. In one case the state cited, police heard gunshots while patrolling an area after reports of gang violence. *Lee* at 277. The only people they found in the vicinity of the gunshots were wearing clothing associated with one of the local gangs, a key factor in the court's finding reasonable suspicion justifying the stop. *Id.* In another case, the only people found in the vicinity of the gunshots fled police, which supported a finding of reasonable suspicion. *See Griffen-Jacobs* at \*1-3. And in some cases, the suspects' behavior supported a finding of reasonable suspicion. *Tally-Clayborne*, 378 Wis.2d 741, 2017 WI App 80, 905 N.W.2d 844, at ¶ 10 (prior to search, officers saw defendant reaching for his waistband when he started to walk away from them); *Faulkner v. State*, 727 S.W.2d 793, 796 (Tex.App.1987) (suspect's truck made a quick U-turn near location of gunshots); *Brooks* at 56 (gunshots occurred at 4:00 a.m., and defendants claimed not to have heard them despite being one block from officers' location when officers heard the gunshots). Here, the officer had no direct evidence suggesting Hairston was engaged in criminal activity—he was calmly walking in a crosswalk, speaking on a cell phone.

{¶ 45} In this case, the gunshots were not particularly close, the officer's only definite suggestion as to the location of the shots was "west," and there was no direct evidence implicating Hairston. These facts suggest that the officers heard

the shots, traveled west, and stopped the first person they encountered. These facts do not support the reasonable and articulable suspicion required to justify a stop.

{¶ 46} Indeed, the other "important consideration" that the majority relies on—that Hairston "was the only person in the area from which the gunshots emanated"—is similarly flawed and not a legitimate factor supporting reasonable suspicion in this case. Leaving aside the fact that the state did not persuasively establish that Hairston had actually been in the vicinity of the gunshots, it is simply not true that Hairston was the only person in the area in which he was stopped. Although he was the only person seen by the officers at the time, nothing he was doing distinguished him from the general population so as to give rise to reasonable suspicion.

{¶ 47} The officers stopped Hairston in a dense residential area. Officer Moore admitted that the area has "a lot of houses" and that "[t]here's a lot of people that live there in all those houses." The aerial photo of the area shows that the officers passed more than three dozen houses driving from the site of the domestic-dispute call to the intersection where they stopped Hairston. There are hundreds more houses in the surrounding area within a mile west of the site of the domestic-dispute call. These circumstances are not comparable with the cases the state cites in support of this purported factor. In fact, it would defy logic to compare this case to those the state cites. In those cases, in which courts heavily relied on the fact that the suspects were the only people found in the vicinity of the gunshots, the vicinity was a deserted commercial area. *See State v. Brown*, 232 Neb. 224, 226-228, 439 N.W.2d 792 (1989) (defendant and two companions were found in a deserted commercial area); *Basiak*, 50 Ill.App.3d at 157, 365 N.E.2d 570 (defendant and another man found in an area with a closed restaurant, its parking garage, and vacant lots).

{¶ 48} Hairston may have been the only person Officer Moore saw while driving to the high school, but there were certainly numerous people in the

18

neighborhood and, importantly, a lot of places to hide. After firing the shots heard by the officers, the shooter could have simply walked inside a house or hidden behind a house or some other obstruction. Although the officers had no duty to search each house and yard, absent any additional specific and articulable facts to support the officers' belief that Hairston was engaged in criminal activity, the fact that Hairston was the only person walking down the street does not help meet the reasonable-suspicion standard.

{¶ 49} This case is also distinguishable from those in which the defendant was the only person found in the vicinity of gunshots in the middle of the night. *See Griffen-Jacobs*, 2017 WL 4992754, at *1 (shortly after midnight); *Brown* at 225 (approximately 2:00 a.m.); *Faulkner* at 796 (around 3:00 a.m.); *Basiak* at 156 (approximately 2:00 a.m.); *Brooks*, 281 So.2d at 56 (4:00 a.m.). Hairston was stopped on the street at around 9:20 p.m. Although 9:20 is relatively late in the evening, it is not a time that one would expect a residential street to be deserted, in contrast with the very late or early-morning hours when the stops in the cited cases occurred.

{¶ 50} In asserting my belief that the officers did not have reasonable suspicion to conduct a *Terry* stop of Hairston, I in no way demean the good work being done by law enforcement who investigate crimes and keep the public safe every day in this state. But I fear that the majority risks more harm to Ohioans by lowering the bar well below the standard the Constitution requires. In this case, officers stopped and searched a person who appeared to be lawfully, casually walking in a crosswalk at 9:20 p.m. in a residential area crowded with homes. Even considering the officers' opinion that the area in which they found Hairston was known for its high crime rate and one officer's "guesstimate" that Hairston was in the vicinity of recent and close gunshots, I would conclude that the state did not prove a reasonable articulable suspicion sufficient to justify the stop of Hairston. Thus, I would conclude that the state violated Hairston's Fourth Amendment rights,

affirm the Tenth District's judgment, and suppress the fruits of the search. Accordingly, I dissent.

———————————

**STEWART, J., dissenting.**

{¶ 51} In this appeal, we are asked to decide a single narrow issue: whether a person's presence near a location police thought gunshots had recently been fired from amounts to particularized suspicion sufficient to conduct an investigatory stop, *see Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). In answering this question, we must either conclude that appellee Jaonte Hairston's Fourth Amendment rights were violated by the stop or adopt a gunfire exception to the Fourth Amendment's requirement that police have an objective basis for suspecting a particular person of criminal activity before stopping that person. The majority opinion does the latter and thereby erodes the Fourth Amendment's particularity requirement.

{¶ 52} Police officers stopped Hairston while he was walking across a street in an area they guessed gunshots had been fired from less than a minute earlier. The majority's holding—that these facts give rise to reasonable suspicion that Hairston had fired the shots or was involved in some criminal activity related to the shots such that stopping and detaining him was lawful—cannot plausibly be squared with decades of United States Supreme Court precedent explaining the particularity requirement.

{¶ 53} The core issue in this case is not whether the police had reason to believe that someone, somewhere had committed a crime but, rather, whether they had *particularized* suspicion of Hairston as the perpetrator sufficient to stop him and do a pat-down for weapons. Despite the obvious relevance of the particularity requirement to this case, the majority not only fails to cite *any* decision explaining that requirement but actually criticizes the court of appeals for focusing on it.

{¶ 54} When the United States Supreme Court issued its decision in *Terry* over 50 years ago, thereby creating an exception to the requirement that police have probable cause to believe that a suspect has committed a crime before seizing him, it was sensitive to the fact that the decision would place certain limits on an individual's Fourth Amendment right to be free from government intrusion to give police the necessary ability to respond to perceived threats to public safety in real time. 392 U.S. at 20-23, 88 S.Ct. 1868, 20 L.Ed.2d 889. The reasonable-suspicion standard announced in *Terry* was meant to balance these two important but often competing interests. *Id*. at 27. The Supreme Court has since remained confident in this standard by virtue of its " 'narrow scope,' " which the court " 'has been careful to maintain.' " *Ybarra v. Illinois*, 444 U.S. 85, 93, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979), quoting *Dunaway* v. *New York*, 442 U.S. 200, 210, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979). The hallmark of *Terry*'s narrow scope is that it requires particularized suspicion. *See United States v. Cortez*, 449 U.S. 411, 417-418, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981).

{¶ 55} Police are required to have had particularized, not generalized, suspicion before a brief investigatory stop may be deemed lawful. *Id.* at 418. Practically speaking, this means that an officer conducting such a stop "must be able to point to specific and articulable facts which, taken together with rational inferences," *Terry* at 21, show "a particularized and objective basis for suspecting the particular person stopped of criminal activity," *Cortez* at 417-418.

{¶ 56} Before determining whether the government has met its burden of showing particularized suspicion, a reviewing court must examine the surrounding circumstances in their totality, including objective observations and any reasonable deductions or inferences that an officer might draw from them, and examine whether "the process just described * * * raise[s] a suspicion that the *particular individual* being stopped is engaged in wrongdoing." (Emphasis added.) *Id.* at 418. As the Supreme Court noted in *Terry*, and again 13 years later in *Cortez*, " 'this

demand for specificity in the information upon which police action is predicated is *the central teaching of this Court's Fourth Amendment jurisprudence.*' " (Emphasis added in *Cortez.*) *Id.*, quoting *Terry* at 21, fn. 18. In other words, police must have distinct, articulable facts specific to the suspect in question at the time of the stop that rise to the level of reasonable suspicion or else the stop is unlawful under the Fourth Amendment.

## I. The trial court improperly applied a subjective reasonable-suspicion standard

**{¶ 57}** At the suppression hearing in this case, Officer Samuel Moore testified to the following specific facts: that he heard gunshots that sounded like they were close and coming from the west, by his "guesstimate" from near an elementary school; that he and his partner drove approximately a half mile, in approximately 60 seconds, to an intersection near the southeast edge of the school's campus; and that having arrived there by the shortest route, they encountered Hairston walking through a crosswalk talking on his cell phone, whereupon they immediately ordered him, with guns drawn, to stop. Officer Moore also identified several surrounding circumstances—namely that it was nighttime, that he knew that the area around the school was a "high crime" area, and that it was also a residential area with a lot of houses. On direct examination, when asked whether he had seen anyone else near the school when the stop occurred, Officer Moore testified that he could not recall, nor could he recall whether he had seen any other vehicles driving by. The significance of these latter facts cannot be overstated, as more fully discussed below.

**{¶ 58}** Based on this limited testimony, the trial court, applying an incorrect, subjective standard, denied Hairston's motion to suppress. Specifically, the trial court stated: "So I think it's a close call because, you know, what's a reasonable suspicion *probably varies from one individual to the next*. But with all

22

the facts that were testified to by the officer, I think they had enough to do a *Terry* stop.  So I'll deny the motion."  (Emphasis added.)

{¶ 59} Literally the first principle of applying the reasonable-suspicion standard is that it does not vary from one individual to the next.  The standard is an objective one, not a subjective one.  *See Terry*, 392 U.S. at 21, 88 S.Ct. 1868, 20 L.Ed.2d 889 ("it is imperative that the facts be judged against an objective standard").  Neither the majority opinion nor the concurring opinion discusses the trial court's application of a subjective standard, obvious though it is.  Nor do they bother to consider how the trial court's standard would necessarily impact a reviewing court's analysis.  Indeed, both opinions sweep the error aside by incorrectly declaring that the trial court applied the standard established in *Terry*.  That is not what happened.  Although the trial court mentioned the *Terry* standard, no reviewing court could look at the trial court's remarks and reasonably conclude that it correctly applied the *Terry* standard.

{¶ 60} Importantly, the trial court's application of the wrong standard also impacts appellate consideration of its factual findings, including any conclusions and inferences drawn from them.  "Appellate review of a motion to suppress presents a mixed question of law and fact."  *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8.  What this means is that a reviewing court "must accept the trial court's findings of fact if they are supported by competent, credible evidence," *id.*, citing *State v. Fanning*, 1 Ohio St.3d 19, 437 N.E.2d 583 (1982); then, "[a]ccepting these facts as true, the appellate court must * * * independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard"—in other words, it must review the legal conclusion de novo.  *Id.*  It is indisputable that the trial court made only a few factual findings in this case, the entirety of which are as follows:

[I]n this case the officers personally heard the shots, personally knew where they came from * * *.

[T]hey personally heard them and went in that direction, and the officer said it only took them a minute or so to get there. And you asked him if he had a hunch, and he said yeah. Well, he did have a hunch, but that doesn't necessarily mean that he didn't have a little more than a hunch when he only saw one person in the area and didn't see any other cars.

{¶ 61} Upon review of these findings, it is unclear whether the trial court reached them by improperly deferring to Officer Moore's view of the situation—as it appears—or by properly using its own independent judgment about what a reasonably prudent officer encountering the same situation would think and do.[4] Indeed, given the lack of competent and credible evidence supporting these findings, it seems more likely that the trial court improperly deferred to Officer Moore's personal belief that he not only had arrived at "where" the shots "came from" but once encountering Hairston there, had particularized suspicion sufficient to stop him. For the trial court to admit that its decision was a "close call" even

---

4. As noted by the Supreme Court in *Terry*:

> The scheme of the Fourth Amendment becomes meaningful only when it is assured that at some point the conduct of those charged with enforcing the laws can be subjected to the more detached, neutral scrutiny of a judge who must evaluate the reasonableness of a particular search or seizure in light of the particular circumstances. And in making that assessment it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search "warrant a man of reasonable caution in the belief" that the action taken was appropriate?

(Footnote omitted.) *Id.* at 21-22, quoting *Carroll v. United States*, 267 U.S. 132, 162, 45 S.Ct. 280, 69 L.Ed. 543 (1925).

while deferring to the subjective suspicions of Officer Moore, rather than considering the objective observations of a reasonably prudent police officer, casts serious doubt on whether the court would have reached the same conclusion if it had applied the correct standard. The majority and concurring opinions' deference to the trial court's factual findings is therefore baffling. At the very least, what this court should do is look at these determinations with a critical eye and explain why they are supported by competent and credible evidence, before determining whether they support a finding of particularized suspicion. Noticeably, both opinions skip this step.[5]

## II. The police lacked a reasonable basis for particularized suspicion of Hairston

{¶ 62} When taken together, the facts and circumstances identified by the police in this case, and any reasonable inferences that can be drawn from them, are too attenuated to support particularized suspicion that Hairston fired the shots or was involved in any way with the gunfire. At a minimum, what is missing is some fact or reasonable factual inference that would connect Hairston to a potential crime.

{¶ 63} The closest thing we have in this regard, although it still hits wide of the mark, is Hairston's walking across a street in the area the officer guessed the

---

5. Toward the end of its opinion, the majority cites this court's decision in *Burnside* and states, "Thus, we conclude that the trial court's denial of the motion to suppress was supported by competent, credible evidence." Majority opinion at ¶ 19, citing 100 Ohio St.3d 152, 2003-Ohio-5372, 792 N.E.2d 71, at ¶ 8. This statement is perplexing for a couple of reasons. First, it shows that the majority has applied the competent-and-credible-evidence standard that we use when reviewing a trial court's factual determinations to its review of the ultimate legal question, which is supposed to be de novo. The statement reflects a lack of understanding regarding proper appellate review of suppression rulings. Second, at no point in its opinion does the majority take the time to actually look at the evidence supporting the trial court's decision and determine that it is in fact competent and credible.

gunfire might have originated. But neither the trial court's finding that Hairston was the sole person in the area nor the officer's guess as to the origin of the gunfire is supported by competent and credible evidence.

{¶ 64} First of all, Officer Moore's testimony was that he did not *recall seeing* any other people or vehicles nearby, and the police report never mentions that Hairston was the only person in the area. This is an important distinction that the majority and concurring opinions also do not discuss. If a finding of particularized suspicion depends on the fact that the person stopped was the only person in the vicinity of suspected criminal activity, then it is of utmost importance that the person actually was the only one there. Officer Moore's inability to recall whether Hairston was the only person seen in the area greatly erodes a reasonable basis for particularized suspicion in this case. Indeed, if this alleged fact did form the basis for the officer's suspicion of Hairston, then the officer should have had no problem recalling whether he had seen anyone else around. The officer's uncertainty on this point significantly undermines the trial court's finding that Hairston was the only one in the vicinity—as does the fact that the area surrounding the school's campus and where Hairston was stopped was also a densely populated neighborhood, a fact that the chief justice's dissent examines in detail.

{¶ 65} Further, nothing about the officer's testimony suggests that his guess as to the location of the gunfire was a particularly good one or indeed was based on anything more than conjecture. For a reviewing court to find particularized suspicion based solely on the *location* of a stop, the officer's guess must be supported by some objective indicia of reliability. As the United States Supreme Court has explained:

Reasonable suspicion, like probable cause, is dependent upon both the content of information possessed by police and its degree of reliability. Both factors—quantity and quality—are considered in

the "totality of the circumstances—the whole picture" that must be taken into account when evaluating whether there is reasonable suspicion.

*Alabama v. White*, 496 U.S. 325, 330, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990), quoting *Cortez*, 449 U.S. at 417, 101 S.Ct. 690, 66 L.Ed.2d 621.

**{¶ 66}** Generally, in a Fourth Amendment case, the prosecution would show that what would otherwise appear to be mere speculation by a police officer was actually a reasonable inference by eliciting from the officer testimony describing how his training or specialized experience led him to draw the inference. *See United States v. Padilla*, 548 F.3d 179, 187 (2d Cir.2008), quoting *United States v. Arvizu*, 534 U.S. 266, 273, 122 S.Ct. 744, 15 L.Ed.2d 740 (2002) ("While the officer may not rely on an 'inchoate and unparticularized suspicion or "hunch," ' [*Terry*] at 27, 88 S.Ct. 1868 [20 L.Ed.2d 889], he is entitled to 'draw on [his] own experience and specialized training to make inferences from and deductions about the cumulative information available to [him] that might well elude an untrained person' " [brackets sic]). But Officer Moore did not do so in his testimony.

**{¶ 67}** During his testimony, Officer Moore offered no insights into how his training or experience aided him in determining the origin of a sound from a distance of nearly a half mile away, nor did he explain why Hairston—who was merely walking across the street and talking on his cell phone near the assumed location—should have been seen as particularly suspicious. Similarly, Officer Moore offered no explanation as to why his search for suspects zeroed in on the precise location where Hairston was stopped (which happened to be only one small corner of the elementary school's otherwise large campus) instead of extending to

the whole area surrounding the school, including its numerous playing fields and outbuildings.[6]

{¶ 68} It was the lack of factual specificity, in terms of both quantity and quality, connecting Hairston to any suspected criminal activity that ultimately resulted in reversal by the court of appeals. The majority and concurring opinions fail to provide any reasons why the appellate court might have been incorrect in concluding that the prosecution failed to satisfy the particularity requirement, and they blindly defer to the trial court's unsupported factual findings.

## III. The court of appeals properly examined the totality of the circumstances

{¶ 69} Rather than consider whether the police had the *particularized* reasonable suspicion required to conduct a *Terry* stop, the majority opinion focuses on facts and circumstances that are irrelevant to that determination. Specifically, the majority opinion claims that the appellate court "went astray by focusing on individual factors in isolation rather than on the totality of the circumstances," "refusing to give any weight to the contextual factors asserted by the state" and placing undue weight on the fact that Hairston did not flee when the officers approached. Majority opinion at ¶ 15. As convenient as these characterizations may be for arriving at the majority's end result, they are not accurate. Even if they were, that would not matter.

{¶ 70} Nothing about the appellate court's decision suggests that it looked at individual factors in isolation. Not only did the court explain that its task was to examine the totality of the circumstances from the objective viewpoint of a reasonable police officer, but it also explained that the Fourth Amendment requires

_____

6. The chief justice's dissenting opinion also highlights how Officer Moore equivocated when testifying about the suspected location of the gunfire and emphasizes that his police report specifies only that the gunfire came from the "west." Again, if nothing more than a person's presence near the location of suspected criminal activity can give rise to reasonable suspicion of that person, then there must be competent and credible evidence supporting the fact that the officers' determination of the location is more than a mere guess. Officer Moore's lack of specificity and continual equivocation undermine the factual credibility determination that the trial court made in this case.

" 'a particularized and objective basis for suspecting the particular person stopped of criminal activity,' " 2017-Ohio-7612, ¶ 10, quoting *Cortez*, 449 U.S. at 417-418, 101 S.Ct. 690, 66 L.Ed.2d 621. Analyzing the circumstances objectively, the appellate court accepted the facts that the officers heard gunshots, that they sounded as if they had come from the west, that the officers came upon Hairston after traveling in that general direction, that it was nighttime in a "high crime" area, and that Hairston appeared nervous *once the police stopped him with their guns drawn*. But when looking at these facts as a whole, the appellate court correctly determined that a crucial piece was missing. That crucial piece, a central requirement under the Fourth Amendment, is some indication giving rise to a reasonable suspicion "that the particular individual being stopped," *Cortez* at 418—Hairston—"[had] engaged" in particular "wrongdoing," *id.*—firing a gun.

{¶ 71} In the absence of any objective, articulable facts reasonably linking Hairston in particular to the gunshots, contextual factors such as the time of day and the area's reputation are of scant analytical value. *See, e.g.*, *Brown v. Texas*, 443 U.S. 47, 52, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979); *United States v. Young*, 707 F.3d 598, 603 (6th Cir.2012); *Bennett v. Eastpointe*, 410 F.3d 810, 830 (6th Cir.2005). The concurring opinion understands this, noting that the appellate court was "correct that the contextual factors of a nighttime stop and a high-crime area were legally irrelevant in Hairston's case." Concurring opinion at ¶ 26. Contrary to the majority's apparent belief, this context by itself does not give rise to the *particularized* suspicion required for police to stop any individual who happens to be present in that context. Rather, all context alone can do is lend support to an officer's inferences that a person's conduct, which might otherwise be wholly innocuous in another context, is reasonably suspicious in the present context.

{¶ 72} Suppose, for example, that an officer observes a person handing a paper bag through a car window to another. In the nighttime, in a neighborhood with a high crime rate, passed between people moving skittishly, it might be

reasonable to suspect that the bag contains contraband. Outside a playground on a sunny morning, handed by an adult to a child, the bag is probably lunch. What we are missing in this case are the handoff and the bag—in other words, the *particularized* suspicion.

{¶ 73} The majority chides the appellate court for focusing part of its analysis on the fact that Hairston did not flee when approached by the police. Specifically, the majority states that "the court placed undue reliance on [this] fact," majority opinion at ¶ 15, and then, as if to support its statement, cites the inapposite case of *State v. Williams*, in which we upheld a police officer's decision to stop and frisk a suspect, despite the suspect's lack of flight, when the officer was able to articulate a number of other suspicious behaviors linking the suspect to a nearby illegal marijuana operation. 51 Ohio St.3d 58, 61-62, 554 N.E.2d 108 (1990). What the majority fails to realize is that it is exploiting the same type of divide-and-conquer method that it unfairly accuses the appellate court of misusing. The fact that Hairston did not flee when approached by the officers *is part of the totality of the circumstances.* The appellate court therefore correctly considered it.

{¶ 74} For the majority to say that the appellate court gave the fact that Hairston did not flee "undue reliance" ignores the reason for discussing it at all— namely, to highlight the paucity of facts and reasonable inferences that could have led a reasonably prudent police officer to suspect Hairston of wrongdoing, or indeed of *any* doing. Having found nothing that would reasonably connect Hairston to the gunfire, the appellate court discussed what might have contributed to reasonable suspicion if certain facts had existed—in this case, flight. It is not illogical that the court would discuss this; there are times when there is so little connecting a person to a crime that police point broadly to a suspect's attempt to elude them. *See Illinois v. Wardlow*, 528 U.S. 119, 124, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000) ("Headlong flight—wherever it occurs—is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such"); *United States v.*

*Lawshea*, 461 F.3d 857, 860 (7th Cir.2006) ("while mere presence in a high-crime area does not in and of itself justify an investigatory stop, suspicious flight, no matter the area, does"). The appellate court properly noted that there was no suspicious flight in this case.

**{¶ 75}** Although it is not totally clear—because again, the majority does not deign to acknowledge the particularity requirement—it seems that the majority is trying to concoct particularized suspicion out of the fact that Hairston happened to be in an area the police believed gunshots were fired from approximately a minute earlier. But as explained above, the officer's speculation about the gunshots' origin is accompanied by no indicia of reliability. Without at least some such indicia, nothing about these facts, contextual or otherwise, allows a court to infer that a reasonably prudent police officer would have found Hairston's presence in that area suspicious in and of itself. Indeed, if any doubt remains as to the reliability of the officers' observations that led to the stop, the majority need look no further than Officer Moore's sworn testimony at the suppression hearing stating that he "guesstimate[d]" the location of gunfire and that he proceeded to stop Hairston based on a "hunch."

**{¶ 76}** Although the majority correctly observes that the Fourth Amendment's reasonable-suspicion requirement does not deal in certainties, it forgets that the requirement also does not deal in unsupported guesses and hunches. *See Terry*, 392 U.S. at 27, 88 S.Ct. 1868, 20 L.Ed.2d 889 (reasonable suspicion requires more than an "inchoate and unparticularized suspicion or 'hunch' "). And yet today, the majority announces that in the seventh most populous state in the nation, a guess and a hunch are sufficient for a *Terry* stop.

**{¶ 77}** By Officer Moore's own account, Hairston was not doing anything suspicious when the officers spotted him. He was walking calmly through a crosswalk while talking on his cell phone. It was not until Officer Moore and his partner exited their vehicle with guns drawn and ordered Hairston to stop that

Hairston gave any indication that he might be nervous. Even so, Officer Moore acknowledged on cross-examination that it is not unreasonable for a person to become nervous with guns pointed at him. But regardless of the reason for it, the fact that Hairston appeared nervous does not much matter since the nervousness was observed only after he was ordered to stop. Anything that happened thereafter is immaterial. The fact that the state relies on Hairston's apparent nervousness after he was ordered to stop to support its position that the police had particularized suspicion *before the stop*—and the fact that the majority mentions it twice in its opinion—highlights just how precarious the factual justification for the stop was in this case. When the police stopped Hairston, all they knew or could reasonably infer was that Hairston was walking through a "high crime" area in which gunshots *may* have been recently fired. But "[a]n individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime." *Wardlow*, 528 U.S. at 124, 120 S.Ct. 673, 145 L.Ed.2d 570, citing *Brown*, 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357.

## IV. There is no "gunfire" or "firearm" exception to the particularity requirement

{¶ 78} The state in this case dedicated a large portion of its briefing to what essentially boils down to an argument advocating for a "gunfire exception" to the particularity requirement of the Fourth Amendment. In response to Hairston's arguments that police could not reasonably have had particularized suspicion based solely on his location and that they could have continued to surveil him for suspicious activity rather than descend upon him with guns drawn and order him to stop, the state argues that the police must be able to respond "differently" when reacting to gunfire. Specifically, the state contends that "an officer who is responding to recent gunfire must have complete command of the scene. A responding officer must be able to protect himself or herself and others by having

32

his or her gun drawn and ready, and the officer *must be able [to] acquire information from individuals at the scene*." (Emphasis added.)

{¶ 79} The state cites decisions—namely, *State v. Johnson*, 8th Dist. Cuyahoga Nos. 71249 and 71250, 1997 Ohio App. LEXIS 4710 (Oct. 23, 1997), and *United States v. Roberson*, 90 F.3d 75, 81 (3d Cir.1996), fn. 4—suggesting that police officers should not have to ensure they are acting on reliable information when stopping a person based on a tip that the person is carrying a weapon. Lost on the state, however, is that the United States Supreme Court has already declined to adopt under the Fourth Amendment a "firearm exception" applicable to when the suspected criminal activity involves an illegal gun, making clear that in such cases, police remain subject to the requirement that the information upon which they act must bear standard indicia of reliability before they may conduct a *Terry* stop. *See Florida v. J.L.*, 529 U.S. 266, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000). Writing for a unanimous court, Justice Ginsburg explained:

A second major argument advanced by Florida and the United States as *amicus* is, in essence, that the standard *Terry* analysis should be modified to license a "firearm exception." Under such an exception, a tip alleging an illegal gun would justify a stop and frisk even if the accusation would fail standard pre-search reliability testing. We decline to adopt this position.

Firearms are dangerous, and extraordinary dangers sometimes justify unusual precautions. Our decisions recognize the serious threat that armed criminals pose to public safety; *Terry*'s rule, which permits protective police searches on the basis of reasonable suspicion rather than demanding that officers meet the higher standard of probable cause, responds to this very concern. *See* 392 U.S. at 30, 88 S.Ct. 1868 [20 L.Ed.2d 889]. But an

automatic firearm exception to our established reliability analysis would rove too far.

*Id.* at 272.

**{¶ 80}** Simply put, there is no special exception to the Fourth Amendment's particularity requirement for gun cases. *See id.*; *see also Chandler v. Miller*, 520 U.S. 305, 308, 117 S.Ct. 1295, 137 L.Ed.2d 513 (1997) ("the Fourth Amendment's "restraint on government conduct generally bars officials from undertaking a search or seizure absent individualized suspicion"). And yet the fact that the majority effortlessly reverses the appellate court's unanimous decision with an incomplete outline of Fourth Amendment law and a brief analysis of the facts tends to show that the majority's holding does not derive from a genuine application of Fourth Amendment law but, rather, from a position that mirrors the state's—that police officers should be allowed to stop anyone when investigating suspected gunfire. Indeed, the majority's statement that "it was reasonable and prudent for the officers to stop Hairston to see if he was the source of or had information about the gunshots," majority opinion at ¶ 18, is not so far off from the state's position that officers responding to gunfire "must be able [to] *acquire information* from individuals at the scene" (emphasis added). Both statements show a predisposition to believe that there is, or should be, a gunfire or firearm exception to the Fourth Amendment's particularity requirement. But there is not. Indeed, neither the state nor the majority have pointed to a single case where a court has found it reasonable and prudent for a police officer to conduct a nonconsensual stop of a person just to see whether he has information about a crime involving gunfire.[7] Rather, in such

---

7. This is not to say that police officers investigating suspected criminal activity cannot approach an individual to ask questions or to secure a scene. It also goes without saying that an officer would reasonably have his weapon at the ready when investigating suspected gunfire. To be clear, this opinion is restricted to a constitutional analysis of whether evidence obtained from the officers' stop

circumstances, a brief investigatory stop of a person is reasonable under the Fourth Amendment only if the police reasonably suspect that the particular person either has committed the crime or is about to commit the crime.

{¶ 81} Such particularized suspicion is wholly absent in this case. I therefore dissent and would conclude that the court of appeals correctly determined that Hairston's Fourth Amendment rights were violated and that the fruits of that constitutional violation should be suppressed.

O'CONNOR, C.J., concurs in the foregoing opinion.

_____

Ron O'Brien, Franklin County Prosecuting Attorney, and Sheryl L. Prichard, Assistant Prosecuting Attorney, for appellant.

Yeura R. Venters, Franklin County Public Defender, and Timothy E. Pierce and Zachary D. Mayo, Assistant Public Defenders, for appellee.

Hunter, Carnahan, Shoub, Byard & Harshman, Russell E. Carnahan, and Robert M. Cody, urging reversal for amicus curiae Fraternal Order of Police, Capital City Lodge No. 9.

Timothy Young, Ohio Public Defender, and Nikki Trautman Baszynski, Assistant Public Defender; Jacqueline C. Greene; David A. Singleton; Raymond T. Faller, Hamilton County Public Defender, and Joshua A. Thompson, Assistant Public Defender; Theresa G. Haire, Montgomery County Public Defender, and Christopher W. Thompson, Assistant Public Defender; Erin E. Davies; and Sarah J. Gelsomino, urging affirmance for amici curiae Office of the Ohio Public Defender, Ohio Chapter of the National Lawyers Guild, Ohio Justice and Policy Center, Hamilton County Public Defender, Montgomery County Public Defender, Juvenile Justice Coalition, and Friedman & Gilbert, L.L.C.

_____

of Hairston and their subsequent search of him should be suppressed on Fourth Amendment grounds. It is not a weigh-in on the procedures or protocols of policing.